**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-

MARIANNE BIRMINGHAM

      Plaintiff,

  v.

EATING RECOVERY CENTER LLC

      Defendant

---

**COMPLAINT**

---

Plaintiff Marianne Birmingham ("Ms. Birmingham"), by and through undersigned counsel, files this Complaint against Defendant Eating Recover Center LLC ("ERC"), a Colorado limited liability company, and states as follows:

**<u>STATEMENT OF THE CASE</u>**

1.      Ms. Birmingham is a highly experienced, competent, and qualified professional who resides in Battle Creek, Michigan. She holds a Bachelor of Arts degree, *magna cum laude,* from Western Michigan University, and also completed a Master of Science in Psychology, *cum laude,* from Capella University. She holds multiple additional professional certifications related to providing high quality compliance in the mental health care industry.

2.      In March 2021, ERC actively recruited Ms. Birmingham to leave her previous employment and relocate from Michigan to Denver as its Vice President Quality, Compliance, and Risk Management. Ms. Birmingham was extensively

interviewed by ERC's senior leadership. ERC offered and Ms. Birmingham accepted the position on March 22, 2021.

3.      Ms. Birmingham began working for ERC on April 26, 2021. The following day, ERC allegedly "discovered" widely publicized information about Ms. Birmingham's previous employer, Sequel Youth and Family Services ("Sequel"), concerning Sequel's response to abuse allegations at several of its facilities in Alabama. ERC falsely claimed that Ms. Birmingham was involved in that response, and that she had concealed this information during this hiring process. Ms. Birmingham denies concealing any such information, and asserts that her resumé and her interview responses accurately provided all information about her work experience, including her roles with Sequel. The public information that ERC allegedly belatedly "discovered" included a nationally televised report aired on NBC in December 2020 about Sequel. The report described allegations by a private advocacy group, and subsequent investigations by state government compliance authorities. The report included a short interview with Ms. Birmingham, and mentioned that she had only recently assumed her role as the company's compliance director.

4.      ERC did not conduct any investigation, and did not allow Ms. Birmingham any opportunity to respond to its unfounded concerns. Instead, ERC jumped to false conclusions that Ms. Birmingham had allegedly "presided" over the Sequel division involved in the aforementioned abuse allegations, "during" the period when the events concerning those allegations had occurred. In fact, she did not, and only assumed a leadership role including that division *after* all of the events in question, just six (6)

months before ERC recruited her. ERC immediately terminated Ms. Birmingham's

employment.

5.      Ms. Birmingham alleges claims of negligent misrepresentation, promissory

estoppel, and outrageous conduct against ERC. This action seeks to recover all

categories of damages provided by law to compensate Ms. Birmingham for these

violations.

## PARTIES, JURISDICTION, AND VENUE

6.      Ms. Birmingham is an individual and resident of the State of Michigan.

7.      ERC is organized under the laws of Colorado with its principal place of

business located at 7351 E. Lowry Blvd, Suite 200, Denver, CO 80230.

8.      This Court has diversity jurisdiction over the parties and subject matter of

this action pursuant to 28 U.S.C. § 1332(a)(1), as Ms. Birmingham alleges damages in

excess of $75,000.

9.      ERC is subject to personal jurisdiction in the District of Colorado because

it is located in this state, and the acts and omissions alleged herein occurred in this

state.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a

substantial part of the events or omissions giving rise to the claims occurred in this

District.

## FACTUAL BACKGROUND

11.     In January 2021, Ms. Birmingham was not actively seeking other

employment.

12.     At that time, Ms. Birmingham was employed by Sequel Youth and Family Services, for which she had worked in several capacities for over 10 years.

13.     At all relevant times, Ms. Birmingham resided in Michigan.

14.     On January 25, 2021, Ms. Birmingham was contacted by Franz Wieshuber of Global Recruiters of Lincoln Square, on behalf of ERC. Mr. Wieshuber told Ms. Birmingham that he was working on a position (for which she later applied, and ERC ultimately hired her).

15.     Ms. Birmingham replied to Mr. Wieshuber with interest to learn more about the position. She and Mr. Wieshuber then discussed the matter by telephone.

16.     On February 16, 2021, Mr. Wieshuber again wrote to Ms. Birmingham, and indicated that "relocation to Denver is now a requirement for the role" and asked if she would consider relocation. Ms. Birmingham indicated that she might, depending on the role and the compensation offered.

17.     Ms. Birmingham and Ms. Wieshuber spoke again on February 22, 2021, and Ms. Birmingham then sent him her resume in connection with her interest in the position.

18.     On Monday, March 8, 2021, Ms. Birmingham was interviewed by ERC's recruiter, Miranda Banach.

19.     On Wednesday, March 10, 2021, Ms. Birmingham's second interview with ERC included Carolyn Sanders, the company's Chief Nursing Officer and the direct supervisor for the position, and also ERC's Vice President of Human Resources, Shannon Gibbons.

20.     On Friday, March 12, 2021, ERC's Chief Financial Officer David Diekmann, and Chief Operating Officer Kurt Koptish interviewed Ms. Birmingham.

21.     Ms. Birmingham was next interviewed on Tuesday, March 16, 2021 by ERC's Chief Executive Officer Rebecca Steinfort, and Executive Chairman, Dr. Ken Weiner.

22.     At the conclusion of this extensive application and multi-interview process, ERC offered Ms. Birmingham the job via its letter dated March 19, 2021, and signed by Ms. Sanders.

23.     Ms. Birmingham promptly accepted and signed the agreement on March 22, 2021. The employment agreement provided:

> Your engagement also is contingent upon (among other things) satisfactory background check and drug test results. Occasionally, these are not completed prior to individuals commencing employment. Although you may begin working for the Company before we actually receive the results of the background check and/or drug test, you should understand that, if those results are deemed unsatisfactory by the Company, your conditional offer will be revoked (although you will be paid for any time you have already worked), and your engagement will be terminated based on those results.

24.     On March 19, 2021, Ms. Birmingham submitted an employment application to ERC's outsourced human resources function.

25.     On March 23, 2021, ERC sent her the background questionnaire, and information about pre-employment health screening via a third-party provider. Ms. Birmingham promptly completed the questionnaire.

26.     Ms. Birmingham was then contacted on March 24 by Shield Screening, on behalf of ERC, for additional information about her employment history, which she provided.

27.     Ms. Birmingham completed all of the contingent requirements, and commenced her employment with ERC on Monday, April 26, 2021.

28.     The employment agreement further provided that ERC would pay Ms. Birmingham an annual base salary of $175,000.

29.     The employment agreement further provided that ERC would pay Ms. Birmingham a discretionary annual bonus of 20% - the latter of which she understood from the interview with CFO Diekmann would be virtually certain/automatic.

30.     In addition, ERC promised Ms. Birmingham 500 units of company stock options, which would vest after two years.

31.     ERC also provided Ms. Birmingham with a relocation agreement, by which it promised to pay her an additional lump sum amount of $17,500 for her relocation expenses to move from Michigan to Denver, with a deadline to complete that move by August 1, 2021. The relocation agreement provided that if Ms. Birmingham resigned or was fired by ERC before two years from the deadline (i.e., August 1, 2023), she would be required to repay a pro rata proportion of that amount.

32.     Based on the extensive pre-employment application and interview process in which she participated, and ERC's employment offer, Ms. Birmingham reasonably understood that ERC was satisfied that she was fully qualified for the position, and that ERC had all of the information it needed to make its informed decision regarding her

hiring. She was fully truthful, forthright, and professional at all times throughout that process.

33.     During the interviews, Ms. Birmingham asked ERC several important questions. First, she asked whether ERC had any serious lawsuits, cases, problems, anything that she should be aware of before she started her role. ERC said no.

34.     However, in her first meeting with the CFO on Monday, April 26, CFO Diekmann told Ms. Birmingham that ERC is currently defending against a sexual abuse lawsuit in which the alleged damages exceed the company's insurance coverage. Thus, ERC misrepresented and concealed this critical and relevant information from Ms. Birmingham.

35.     In addition, ERC told Ms. Birmingham that her team had a "couple" of vacancies that needed to be filled. Instead, when she started, she then learned that half of her team was vacant – another gross misrepresentation that directly implicates ERC's false portrayal to her regarding its purportedly robust risk management posture in its facilities.

36.     On Tuesday, April 27, 2021, Ms. Birmingham met with Dr. Weiner. During that meeting, Dr. Weiner asked her several questions about her previous employer, Sequel, including concerning private equity and other financial details. Dr. Weiner – who, again, previously participated with CEO Steinfort in the interview on March 16 – did not express any concerns at that time.

37.     The following morning, Wednesday, April 28, 2021, Ms. Sanders called Ms. Birmingham and directed her to immediately suspend all activities regarding her

employment. Ms. Sanders told Ms. Birmingham that a "teammate" had searched Ms. Birmingham's name on the internet, and found a "disturbing article" from December. According to Ms. Sanders, the article discussed Ms. Birmingham's involvement in Sequel's response to the abuse allegations at its Alabama facility. Ms. Sanders stated that ERC was concerned that Ms. Birmingham did not disclose this during the pre-employment process.

38.     Ms. Birmingham responded that she did not intentionally conceal or fail to disclose anything. Shortly thereafter, Ms. Birmingham texted Ms. Sanders, "If you would like me to answer any questions or speak further, let me know." Ms. Sanders replied, "I will".

39.     Later that morning, Ms. Birmingham spoke with Mr. Weishuber, who told her that the night before, CEO Steinfort had emailed him the article at issue, and asked "did you know about this?"

40.     Finally, Ms. Sanders again called Ms. Birmingham later in the afternoon of April 28, 2021, and terminated her employment.

41.     In a follow-up message to Ms. Sanders, Ms. Birmingham asked if ERC would send her written notice of termination. Ms. Sanders replied no, but that "you can use this email to serve as documentation that ERC has rescinded it's [sic] offer and ended your employment effective today."

42.     Counsel representing ERC wrote the undersigned a letter dated May 11, 2021. In it, counsel asserted: "ERC has now learned that Ms. Birmingham presided as Regional Director of Compliance and Quality for Sequel Youth and Family Services'

Child Welfare Division during years of child abuse allegations at an Alabama Sequel facility, which has been described as a house of child and adolescent horrors in news reports."

43.     This statement in counsel's May 11 letter is completely false.

44.     Had ERC actually asked Ms. Birmingham any questions about the issue, or accepted her offer to provide the relevant information, she would have explained that she had no responsibility for Sequel's facilities in Alabama during the relevant time frame, i.e. when the alleged abuse occurred.

45.     For the two years prior to July 2020, Ms. Birmingham was the Regional Director of "Administrative Services" (her original title in that position). In that capacity, she was assigned to oversee Sequel's Child Welfare division, in addition to other roles and responsibilities including HIPAA Security Officer.

46.     In late 2019, Ms. Birmingham's title with Sequel was revised from "Administrative Services" to "Compliance and Quality". This cosmetic change did not reflect any difference in substance or any change in her job duties.

47.     Regardless, Sequel's Child Welfare "division" did not include Alabama, or the particular facility(ies) involved in the abuse allegations that were later investigated and publicized.

48.     In her capacity as Sequel's Regional Director of Compliance and Quality, Ms. Birmingham's division included facilities across nine (9) states – which did not include Alabama.

49.     Only later, after she was promoted and commenced her new role as Sequel's Senior Director of Compliance and Quality in July 2020, did Ms. Birmingham assume responsibilities that included participation in and oversight of Sequel's subsequent responses to those allegations.

50.     Any reasonable investigation of Ms. Birmingham on the internet, or even just simple discourse before hiring her for a senior position in the company's corporate leadership, at the Vice President level, would have disclosed those actual details of her role and responsibility in connection with the Alabama facility matter. On behalf of Sequel, she even gave a television interview to NBC, which aired as part of NBC News' report on December 16, 2020, in which she discussed those facts in detail.

51.     Upon information and belief, the aforementioned NBC News report is, in fact, the article that ERC belatedly "discovered", and which formed the sole basis for ERC's false conclusions about Ms. Birmingham.

52.     The NBC report/article did not state, or even suggest, that Ms. Birmingham had any direct or even indirect responsibility for the Alabama facility during the events at issue. In fact, NBC correctly reported that she had recently assumed the rule of Senior Director. In the interview, she fully agreed with the importance of the matter and the need to ensure comprehensive investigation and remediation of the issues identified.

53.     If anything, Ms. Birmingham's performance of her duties for Sequel, in connection with the company's participation in and/or response to the NBC report, positively illustrates the very qualities that made her the best candidate for the ERC job.

54.    In reasonable reliance on her agreement with ERC and the promises contained therein, as well as the expectation of her new employment and a new life for herself and her family in Denver, Ms. Birmingham incurred substantial expenses.

55.    Ms.  Birmingham signed a residential lease in Denver. Although she was subsequently able to arrange a sublease for that residence, she was required to pay substantial additional cost.

56.    Ms. Birmingham also purchased moving supplies, materials, and other items, in preparation for the move.

57.    Ms. Birmingham also sold or transferred other property in preparation for the move.

58.    Ms. Birmingham's contractually promised compensation with ERC was $50,000 per year higher than her Sequel salary.

59.    Ms. Birmingham would have been fully successful at ERC. The company expected that she would continue there at least until August 1, 2023, if not much longer.

60.    ERC would have paid Ms. Birmingham's relocation amount.

61.    Ms. Birmingham would have earned, and ERC would have paid her annual bonuses.

62.    Ms. Birmingham would have vested her stock options with ERC, which have/had substantial additional value.

63.    Ms. Birmingham is the primary breadwinner in her family. In anticipation for the family's imminent move to Denver for her new job with ERC, her husband made

arrangements to continue his current employment by working remotely. Parents of a five-year-old, they evaluated child care and education options for their child.

64.     Ms. Birmingham had eagerly looked forward to her new job with ERC, which represented a significant and well-earned achievement and advancement for her professionally. Instead, ERC removed that opportunity from her based on ill-considered and completely unfounded assumptions about her work experience that it had failed to explore before it hired her.

65.     As a result, Ms. Birmingham has suffered financial and other harms proximately caused by ERC, in amounts that exceed $75,000.

## FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT

66.     Ms. Birmingham incorporates all previous paragraphs.

67.     Ms. Birmingham's employment agreement with ERC was a bilateral express written contract, supported by adequate mutual consideration.

68.     ERC's promises to Ms. Birmingham of additional relocation compensation, and stock options which would vest after two years, induced her to leave her previous employment and arrange to move to Denver. These promises represent special consideration so that her employment was not terminable at will.

69.     ERC's termination of Ms. Birmingham, on the second day of her employment, breached its contract with her.

70.     ERC's breach of the contract proximately caused Ms. Birmingham damages.

## SECOND CLAIM FOR RELIEF – NEGLIGENT MISPRESENTATION

71.     Ms. Birmingham incorporates all previous paragraphs.

72.     ERC gave information to Ms. Birmingham, to wit: it offered her employment, contingent upon a satisfactory background check and drug test results.

73.     This information was false, in that Ms. Birmingham fully and successfully completed all contingent requirements specified by ERC, but ERC fired her anyway based on its belated "discovery" of widely publicized information about her previous employer, upon which it based unfounded and false assumptions about her prior work experience.

74.     ERC gave information to Ms. Birmingham, to wit: that it could terminate her engagement at any time, subject to the provision of the parties' agreement.

75.     This information was false, in that the agreement does not permit termination of employment because of ERC's failure to adequately investigate Ms. Birmingham's work experience and "discover" widely publicized information about her previous employer, upon which it based unfounded and false assumptions about her prior work experience.

76.     ERC fired Ms. Birmingham based on its belated "discovery" of such information, upon which it based unfounded and false assumptions about her prior work experience.

77.     ERC's employment offer to Ms. Birmingham was not contingent on its failure to discover and consider widely publicized information about her previous employer and her roles and responsibilities while employed by that employer.

78.     ERC's employment offer to Ms. Birmingham was not contingent on its failure to consider the information accurately presented in her resumé regarding her previous employer and her roles and responsibilities while employed by that employer.

79.     ERC's employment offer to Ms. Birmingham was not contingent on its failure to adequately inquire, over the course of multiple interviews, about her previous employer and her roles and responsibilities while employed by that employer.

80.     ERC gave information to Ms. Birmingham, to wit: that ERC did not have any serious lawsuits, cases, problems, anything that she should be aware of before she accepted employment with the company.

81.     This information was false, in that after she began her employment, Ms. Birmingham learned that ERC was currently defending a lawsuit alleging sexual abuse, in which the alleged damages exceed the company's insurance coverage for such a claim(s).

82.     ERC gave information to Ms. Birmingham, to wit: that her "team" - i.e., multiple other company employees over whom she would have substantial authority and with whom she would need to work to perform her job duties - had a "couple" of vacancies that needed to be filled. Instead, when she began working for ERC, Ms. Birmingham learned that in fact *half* of the positions on her team were vacant.

83.     ERC gave the aforementioned information to Ms. Birmingham in the course of its offer of employment to her, and for her guidance in the related proposed business transactions between them, as described in the parties' agreement.

84.     Ms. Birmingham relied on the information supplied to her by ERC.

85.     Ms. Birmingham's reliance on the information supplied to her by ERC caused her damage.

## THIRD CLAIM FOR RELIEF - LURING

86.     Ms. Birmingham incorporates all previous paragraphs.

87.     ERC induced, influenced, persuaded, and engaged Ms. Birmingham to leave her previous employment in Michigan to begin working for ERC.

88.     In the course of recruiting, interviewing, and hiring her, ERC impliedly made representations to Ms. Birmingham, to wit: that it had conducted an extensive review of her experience and qualifications for this senior corporate Vice President position before selecting her for the job; that it had the ability and the opportunity to investigate any potential concerns it might have had regarding her previous employment with Sequel; and that it had the ability and opportunity to check her references, and otherwise investigate and confirm any information that she presented in her resumé, and in response to questions posed to her during multiple interviews with the company's senior leadership.

89.     ERC's implied representations to Ms. Birmingham were false and deceptive, in that it recklessly failed to conduct a review of her previous job experience adequate to discover the widely publicized national news media story about Sequel, which discussed the multiple complaints of alleged abuse at several of Sequel's facilities which were investigated by state government regulators. It failed to "discover" this information despite the fact that ERC knew that Ms. Birmingham worked for ERC

when it recruited her, and that her then-current job title with Sequel since July 2020 was "Senior Director of Compliance and Quality".

90.   In the course of recruiting, interviewing, and hiring her, ERC also made express representations to Ms. Birmingham regarding the vacancies on her "team", and the existence of a serious abuse lawsuit – both of which constituted significant concerns that Ms. Birmingham reasonably expected ERC to truthfully disclose and discuss with her, so that she could make an adequately informed decision whether to accept ERC's employment offer, leave her current job and agree to move herself and her family from Michigan to Denver.

91.   ERC's express representations to Ms. Birmingham were false and deceptive, in that the aforementioned vacancies were far greater in number than "a couple", and that it was facing a pending serious abuse lawsuit that it failed to disclose in response to Ms. Birmingham's direct inquiry about any such concerns.

92.   By means of the its false and deceptive representations, ERC induced, influenced, persuaded, and engaged Ms. Birmingham to accept and commence employment with ERC.

93.   ERC's conduct proximately caused Ms. Birmingham to suffer damages.

94.   Ms. Birmingham is entitled to recover her damages, and her reasonable attorney fees, pursuant to Colorado Revised Statutes, C.R.S. § 8-2-107.

## FOURTH CLAIM FOR RELIEF –
## IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

95.   Ms. Birmingham incorporates all previous paragraphs.

96.     Ms. Birmingham and ERC, as parties to an employment relationship, owed each other a duty of good faith and fair dealing.

97.     The implied duty of good faith and fair dealing applies to the parties' employment relationship at issue.

98.     The parties' implied duty of good faith and fair dealing to each other included each party's obligation not to deprive the other party of the benefit of their contractual relationship.

99.     The parties' implied duty of good faith and fair dealing to each other included the duty not to terminate the employment relationship for the purpose of preventing the vesting or accrual of an employee right or benefit.

100.    ERC violated its implied duty of good faith and fair dealing to Ms. Birmingham by terminating her employment to deprive her of the benefit of that relationship, and to prevent Ms. Birmingham from vesting or accruing her rights and benefits as an employee – including, but not limited to, her  compensation.

## FIFTH CLAIM FOR RELIEF – PROMISSORY ESTOPPEL

101.    Ms. Birmingham incorporates all previous paragraphs.

102.    Ms. Birmingham reasonably relied on ERC's promises of employment, higher compensation, valuable immediate and future employment benefits, and additional relocation-related compensation.

103.    Based on her reasonable reliance on ERC's promises to her, Ms. Birmingham was induced to resign her previous employment with Sequel.

104.   Based on her reasonable reliance on ERC's promises to her, Ms. Birmingham was induced to purchase supplies and to incur other expenses required to prepare for moving herself and her family from Michigan to Denver.

105.   Based on her reasonable reliance on ERC's promises to her, Ms. Birmingham was induced to sell or transfer various personal and other property, to prepare for moving herself and her family from Michigan to Denver.

106.   Based on her reasonable reliance on ERC's promises to her, Ms. Birmingham was induced to enter into a lease contract for a residence in Denver, where she intended to live with her family after relocating.

107.   As a result of its breaches of its promises to her, upon which she reasonably relied to her detriment, ERC caused Ms. Birmingham to suffer substantial damages.

## SIXTH CLAIM FOR RELIEF – OUTRAGEOUS CONDUCT

108.   Ms. Birmingham incorporates all previous paragraphs.

109.   By hiring and then firing Ms. Birmingham in the manner and under the circumstances described above, ERC engaged in extreme and outrageous conduct.

110.   ERC's conduct was reckless, in that it knew or should have known of obvious potential concerns it might have in hiring a prominent former employee away from Sequel.

111.   By blaming Ms. Birmingham for, and firing her because of, its own extraordinary pre-hiring negligence in allegedly failing to "discover" obvious information

about her previous employment history, ERC engaged in extreme and outrageous conduct.

112.    ERC's conduct was reckless, in that it knew that it, not Ms. Birmingham, was negligent and directly responsible for failing to "discover" widely publicized information about Sequel.

113.    ERC's conduct was reckless, in that refused to allow Ms. Birmingham to present the truth about her employment with Sequel, which would have corrected ERC's unfounded and false assumptions.

114.    ERC's extreme and outrageous conduct caused Ms. Birmingham to suffer severe emotional distress.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Ms. Birmingham requests that the Court enter judgment in favor of herself and against ERC as follows:

1.    Back pay damages in the amount of what she reasonably would have earned working for ERC, less mitigation;

2.    Future economic damages until she is able to fully mitigate her loss of wages due to ERC's unlawful termination of her employment;

3.    Noneconomic damages for her emotional distress proximately caused by ERC's outrageous conduct;

Punitive damages because of ERC's wrongs done to her, which were attended by its willful and wanton conduct; [*pursuant to Colo. Rev. Stat. 13-21-102(1.5)(a), Plaintiff

intends to seek leave to amend this Complaint to include her claim for exemplary damages, and present prima facie proof of a triable issue regarding same.]

4.      ERC's share of FICA, FUTA, state unemployment insurance, and any other required employment taxes on any amount(s) of damages constituting wages;

5.      An award of reasonable attorney fees and costs in this matter; and

6.      Such other and further relief as the Court deems just and proper.

Respectfully submitted this 15th day of June 2021.

*/s/ Gary M. Kramer*
Gary M. Kramer
Gary Kramer Law, LLC
1465 Kelly Johnson Blvd, Suite 210
Colorado Springs, CO 80920
Phone 719-694-2783
Fax 719-452-3622
gary@garykramerlaw.com
Attorney for Marianne Birmingham

-20-